**No. 23-4332**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

AMY KONDA

*Plaintiff-Appellant*,

v.

UNITED AIRLINES, INC.

*Defendant-Appellee.*

On Appeal from the United States District
Court for the Western District of Washington
No. 2:21-cv-01320-KKE
Hon. Kymberly K. Evanson

**APPELLANT'S OPENING BRIEF**

John G. Barton, WSBA No. 25323
The Barton Law Firm
1567 Highlands Dr NE Ste 110-34
Issaquah, WA 98029-6245
(425) 243-7960
TheBartonLawFirm@GMail.com
*Attorney for Appellant Amy Konda*

**Table of Contents**

TABLE OF AUTHORITIES ................................................................. 3

INTRODUCTION ............................................................................... 6

JURISDICTIONAL STATEMENT ....................................................... 8

STATUTORY AND REGULATORY AUTHORITIES .......................... 8

ISSUES PRESENTED ......................................................................... 9

STANDARD OF REVIEW ................................................................. 12

STATEMENT OF THE CASE ........................................................... 12

   A.  KONDA COULD SAFELY DRIVE. ................................................ 13
   B.  UA ASSIGNED JET BRIDGE DRIVING. ..................................... 16
   C.  KONDA ASKED A QUESTION. ................................................... 17
   D.  NO EFFORT TO COMPLY WITH BONA FIDE OCCUPATIONAL QUALIFICATION REQUIREMENTS. ............................................. 19
   E.  DIRECT TO ACCOMMODATION. ................................................ 20
   F.  INSUFFICIENT INFORMATION AND INSTRUCTIONS TO DOCTOR. ..... 22
   G.  UNINFORMED AND INADEQUATE MEDICAL EXAM. .................... 23
   H.  INFERRED OPINION TREATED AS DISPOSITIVE. ........................ 24
   I.  ACKNOWLEDGEMENT THAT RESTRICTION IN EFFECT. ............. 25
   J.  RESULTS DICTATED AT THE MAY 29 RAP MEETING. ............... 25
   K.  COMPELLED TO CHOOSE TRANSFER OR UNPAID LEAVE. ......... 26
   L.  DELAYED RETURN TO WORK. ................................................. 28
   M.  HARM. .................................................................................... 30

SUMMARY OF THE ARGUMENT ................................................... 30

ARGUMENT ................................................................................... 32

DISCRIMINATION .......................................................................... 32

   A.  SUMMARY JUDGMENT STANDARD ......................................... 32
   B.  DISABILITY DISCRIMINATION UNDER THE WLAD ................. 33
      1.  *WLAD Elements* .......................................................... 33
      2.  *Direct and Circumstantial Evidence* .......................... 34
      3.  *Burden Shifting* .......................................................... 36
      4.  *EFJS and Occupational Qualifications* ...................... 38
      5.  *Proof a Function is Essential* ..................................... 40
      6.  *Employer's Duty to Gather Information and Make Individualized Assessment* .......................................................... 41

i

7.    *Reliance On a Doctor's Opinion Pursuant to WAC 162-22-090*...............42

8.    *Scope of a Disability* ................................................................43

9.    *Disparate Treatment in Terms and Conditions* ..........................44

10.   *"Because of" Disability* .......................................................45

11.   *Substantial Factor* ..............................................................46

12.   *BFOQ is an Affirmative Defense*............................................46

13.   *Business Necessity Defense is Not Applicable to Disparate Treatment.*48

C.   KONDA PROVED UA DISCRIMINATED AGAINST HER BASED ON HER DISABILITY ..............................................................................48

1.    *Konda Proved She Could Perform the Actual EFJs of the SOR Position*.48

2.    *Konda Proved She Could Perform the EFJs of Driving*............................49

3.    *Konda Proved She Could Drive Safely*....................................50

4.    *Konda Proved UA was Substantially Motivated by Her Disability*..........52

5.    *Each Adverse Action Caused All of the Harm*............................53

6.    *The Court Should Not Consider a BFOQ Defense*....................53

7.    *The Court Should Not Consider a Business Necessity Defense* ...............54

**ACCOMMODATION**...............................................................**54**

A.   ELEMENTS ........................................................................54

B.   MANDATORY INTERACTIVE ACCOMMODATION PROCESS .........54

C.   DISCUSSION ........................................................................56

1.    *Konda Proved UA Failed to Try to Accommodate Her in Her Position and Failed to Engage in a Good Faith Interactive Process*....................................56

2.    *Konda Proved UA Could Have Immediately Accommodated Her in Her Position* ........................................................................57

**CONCLUSION** ........................................................................**57**

**FORM 17. STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6**........................................................................**59**

**FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS**......................**60**

**ADDENDUM**........................................................................**62**

# TABLE OF AUTHORITIES

<u>Cases</u>

*Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) ......................................54

*Alonso v. Qwest Commc'ns Co.*, 178 Wash. App. 734, 315 P.3d 610 (2013) .........34

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................31

*Anderson v. Little League Baseball, Inc.*, 794 F. Supp 342 (D. Ariz. 1992)..........41

*Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654 (9th Cir. 2002) ........35

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000) ..................................53, 55

*Bates v. UPS*, 511 F.3d 974 (9th Cir. 2007)...........................................36, 37, 38, 39

*Bell v. Boeing Co.*, 599 F. Supp. 3d 1052 (9th Cir. 2022)......................................37

*Blackburn v. Soc. & Health Servs.*, 186 Wash. 2d 250, 375 P.3d 1076 (2016) ......43

*Blanchette v. Spokane Cnty. Fire Prot. Dist. No. 1*, 67 Wash. App. 499, 836 P.2d 858 (1992) ...............................................................................................................45

*Brzycki v. Univ. of Wash.*, CASE NO. C18-1582 CKJ, 2021 U.S. Dist. LEXIS 30574 (W.D. Wash. Feb. 18, 2021) ....................................................................44

*Carlson v. City of Spokane*, No. 13-CV-0320-TOR, 2014 U.S. Dist. LEXIS 148976 (E.D. Wash. Oct. 20, 2014) ....................................................34, 36, 38, 39, 42, 43

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)......................................................32

*Chevron U.S.A. v. Echazabal*, 536 U.S. 73 (2002);................................................41

*Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115 (9th Cir. 2000)..............................32

*City of Seattle v. Am. Healthcare Servs.*, Inc., 13 Wash. App. 2d 838, 468 P.3d 637 (2020). ................................................................................................................40

*Class v. Towson Univ.*, 806 F.3d 236 (4th Cir. 2015) ............................................42

*Cornwell v. Microsoft Corp.*, 192 Wash. 2d 403, 430 P.3d 229 (2018).................35

*Cravens v. Blue Cross & Blue Shield*, 214 F.3d 1011 (8th Cir. 2000)....................54

*Davis v. Microsoft Corp.*, 149 Wash. 2d 521, 70 P.3d 126 (2003). .......................37

*Dedman v. Wash. Pers. Appeals Bd.*, 98 Wash. App. 471, 989 P.2d 1214 (1999); 40

*Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027 (9th Cir. 2005)..............35

*EEOC v. Wal-Mart*, 477 F.3d 561 (8th Cir. 2007)................................................36

*Enlow v. Salem–Keizer Yellow Cab Co.*, 389 F.3d 802 (9th Cir. 2004).................34

*Ezell v. Potter*, 400 F.3d 1041 (7th Cir. 2005) ......................................................35

*Fey v. State*, 174 Wash. App. 435, 300 P.3d 435 (2013) ...............................46, 47

*Frisino v. Seattle Sch. Dist. No. 1*, 160 Wash. App. 765, 249 P.3d 1044 (2011)....55

*Gifford v. Atchison, T. & S. F. R. Co.*, 685 F.2d 1149 (9th Cir. 1982)...................39

*Gillen v. Fallon Ambul. Serv.*, 283 F.3d 11 (1st Cir. 2002) ...................................42

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998) ...............................35

*Goodman v. Boeing Co.*, 127 Wash. 2d 401, 899 P.2d 1265 (1995)................53, 54

*Harris v. Pan American World Airways, Inc.*, 649 F.2d 670 (9th Cir. 1980) .........39

iii

*Harting v. Barton*, 101 Wash. App. 954, 6 P.3d 91 (2000)....................................45

*Hegwine v. Longview Fibre Co.*, 128 Wash. App. 340, 115 P.3d 1065 (2007), *rev. den.*, 156 Wash. 2d 1027, 133 P.3d 473 (2006) ....................................................37

*Hegwine v. Longview Fibre Co.*, 162 Wash. 2d 340, 172 P.3d 688 (2007)......37, 43

*Hill v. BCTI Income Fund-I*, 144 Wash. 2d 172, 23 P.3d 47 (2001).......................33

*Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128 (9th Cir. 2001) .........................42

*In re Palmer*, 145 Wash. App. 249, 187 P.3d 758 (2008)......................................45

*Johnson v. Chevron U.S.A., Inc*., 159 Wash. App. 18, 244 P.3d 438 (2010)..........43

*Kastanis v. Educ. Emps. Credit Union*, 122 Wash. 2d 483, 859 P.2d 26 (1993)....34

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).................................................31

*Mackay v. Acorn Custom Cabinetry*, 127 Wash. App. 302, 898 P.2d 284 (1995)..45

*Mantolete v. Bolger*, 767 F.2d 1416 (9th Cir. 1985);..............................................40

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........31, 32

*McDaniels v. Grp. Health Coop.*, 57 F. Supp. 3d 1300 (W.D. Wash. 2014)..........53

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).....................................33

*Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty*, 189 Wash. 2d 516, 404 P.3d 464 (2017) ..........................................................................................................35

*Moore v. CVS Rx Servs.*, 142 F. Supp. 3d 321 (M.D. Pa. 2015), *aff'd*, 660 F. App'x 149 (3d Cir. 2016) ............................................................................................54

*Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243 (9th Cir. 1999) ............................41

*Or. Nat'l Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024 (9th Cir. 2020).....11, 29

*Pannell v. Food Services of America*, 61 Wash. App. 418, 810 P.2d 952 (Div. 1, 1991)..................................................................................................................34

*Peterson v. Smurfit-Stone Container,* No. 51852-6-I, 2004 Wash. App. LEXIS 1146 (June 1, 2004) .........................................................................................43

*Pulcino v. Fed. Express*, 141 Wash. 2d 629 9 P.3d 787 (2000).................43, 53, 54

*Rashdan v. Geissberger*, 764 F.3d 1179 (9th Cir. 2014)........................................34

*Riehl v. Foodmaker, Inc.,* 152 Wash. 2d 138, 94 P.3d 930 (2004) .........................33

*Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468 (5th Cir. 2006).............42

*Rose v. Hanna Mining Co.*, 94 Wash. 2d 307, 616 P.2d 1229 (1980) ...................38

*Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233 (9th Cir. 2012)...36, 39

*Scrivener v. Clark Coll.,* 181 Wash. 2d 439, 334 P.3d 541 (2014).............32, 33, 36

*Shannon v. Pay N' Save Corp*., 104 Wash. 2d 722, 709 P.2d 799 (1985)..............47

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) .......................................36, 39

*Stevens*, 200 Wash. 2d 531, 519 P.3d 208 (2022) .................................................43

*Stewart v. Snohomish Cnty. Pub. Util. Dist. No. 1*, 752 F. App'x 444 (9th Cir. 2018).................................................................................................................46

*Stewart v. Snohomish Cnty. Pud No. 1*, 262 F. Supp. 3d 1089 (W.D. Wash. 2017) ..........................................................................................................................43

*Stork v. Int'l Bazaar*, 54 Wash. App. 274, 774 P.2d 22 (1989) ..............................33

iv

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999) ..............................54

Statutes

28 U.S.C. § 1291 ...........................................................................................7
28 U.S.C. § 1332 ...........................................................................................7
42 U.S.C. § 12112 ...................................................................................43, 44
Wash. Rev. Code § 49.60.020 .....................................................................33
Wash. Rev. Code § 49.60.040 .....................................................................41
Wash. Rev. Code § 49.60.180 .............................................................32, 43, 44, 47

Rules

29 C.F.R. § 1630.2..............................................................................37, 38, 48
ER 1314 .........................................................................................................33
Fed. R. Civ. P. 12 .........................................................................................45
Fed. R. Civ. P. 56 ...................................................................................31, 32
Fed. R. Civ. P. 8 ...........................................................................................45

Regulations

WAC 162-16-240 ..........................................................................................44
WAC 162-16-27 ............................................................................................38
WAC 162-22-090 ....................................................................................41, 42

## INTRODUCTION

Appellant, Amy Konda, ("Konda") started working for UA in 1988. In 1991, Appellee United Airlines, Inc. ("UA"), discriminated against Konda based on her diabetes. When Konda applied for a position that included driving jet bridges (**"driving"**),[1] UA permanently banned her from driving due to her diabetes based on a safety occupational qualification (**"the 1991 qualification"**). The ban was based on a facially discriminatory occupational qualification that banned all diabetics. Konda filed a disability discrimination complaint and provided UA medical evidence that she had no symptoms or limitations. UA settled and paid Konda damages. Konda withdrew her application for the job. The settlement did not state whether the ban was lifted.

In 2018, UA added driving to Konda's job. Konda explained to her supervisor that she had not yet trained to drive because of the ban and asked whether UA intended to enforce the 1991 qualification. In response to her question, and only that question, UA compelled Konda to submit to a Reasonable Accommodation Process (**"RAP"**) and a compelled medical exam (**"the compelled exam"**). The stated purpose of the RAP and compelled medical exam was to identify an accommodation.

---

[1] A jet bridge, or passenger loading bridge, is a mobile walkway for passenger boarding which extends from the airport terminal gate to an airplane. See SKYBRARY, "PASSENGER BOARDING BRIDGE," https://skybrary.aero/articles/passenger-boarding-bridge (last visited Aug. 23, 2023).

UA provided the doctor a "Work Restriction Form" ("**WRF**") and told the doctor to list restrictions and information to help UA identify an accommodation. UA provided the doctor with no description of jet bridge driving and none of the information an employer must provide a doctor if the employer intends to rely on the doctor's opinion. WAC 162-22-090.

The doctor listed the driving restriction and provided a generic description of Konda's type of diabetes. UA inferred an opinion from the unexplained restriction and relied on the inferred opinion in violation of the WAC. UA treated the unlawful, unexplained, and inferred opinion as definitive.

UA required Konda to be *available* to drive three times a week at 2:45 am for a total of 15 minutes each time. Jet bridges, however, were rarely driven at that time. UA decided driving was an essential function of the job ("**EFJ**"), which Konda held.

UA treated its safety requirement as being part of the driving's EFJ, rather than an occupational qualification. UA had 28 years of evidence that Konda did not have symptoms of diabetes. In 2018, UA reviewed none of the information. It gathered no information about Konda's actual symptoms, limitations, or ability to perform. It gathered no information on whether the mechanics and safety features of driving would allow a diabetic's symptoms to create a hazard. Based on the unexplained, unlawful, inferred opinion, UA compelled Konda to accept either a job transfer or unpaid leave ("**the compelled choice**"). Konda chose unpaid leave.

7

Konda provided a doctor's opinion as proof that Konda was "able to detect and treat [hypoglycemic episodes] immediately on her own." UA kept Konda on unpaid leave. ("**the delayed return to work**")

UA eventually accommodated Konda by not interfering with Konda's rights under the Americans with Disabilities Act ("**ADA**") and Washington Law Against Discrimination ("**WLAD**"). Specifically, UA allowed Konda to drive on the condition Konda bring recovery food and insulin with her, something Konda had always done.

## JURISDICTIONAL STATEMENT

Konda sued UA in the Superior Court of Washington for King County alleging disparate-treatment disability discrimination and failure to accommodate under Washington State law. UA moved to remove to the United States District Court for the Western District of Washington pursuant to diversity jurisdiction, 28 U.S.C. § 1332(a). 7-ER-1369. The District Court entered an *Order on Cross-Motions for Summary Judgment* and a *Judgment in a Civil Case* on November 21, 2023, denying Konda's motion and granting UA's. 1-ER-2 – 15. Konda timely filed a notice of appeal on December 20, 2023. 7-ER-1372-74. This court has jurisdiction because this is an appeal of a final order of the District Court disposing of all parties' claims. 28 U.S.C. § 1291.

## STATUTORY AND REGULATORY AUTHORITIES

The full text of the relevant statutory provisions and rules are set forth in the addendum filed concurrently with this brief. *See* 9th Cir. R. 28-2.7.

## ISSUES PRESENTED

1.    Did the trial court ("**the court**") err in granting UA's and denying Konda's motion for summary judgment on Konda's claim for disparate-treatment disability discrimination under the WLAD? 1-ER-13.

2.    Did the court err in rejecting—expressly rejecting—the relevance of the amount of time Konda spent driving in the court's consideration of whether driving was an essential function of Konda's specific job and in finding that driving was an essential function where the amount of time is one of the factors that employers must consider when assessing whether a function is essential pursuant to WPI 330.37(3)(3)? 1-ER-9.

3.    Did Konda prove that she could perform the essential functions of her job, which did not include driving?

4.    Assuming jet bridge driving was an EFJ of Konda's specific job, did the court err in finding that Konda failed to prove a prima facie case that she could drive where she showed she had normal mental skills and physical dexterity and could

push the required button and a joystick to successfully maneuver the jet bridge into place? 1-ER-9-11.

5.     Did the court err in treating UA's safety occupational qualification as a job function and requiring Konda to address, produce evidence on, and prove her ability to comply in her discrimination proof? WPI 330.32. 1-ER-9-11.

6.     Assuming UA's safety requirement was an EFJ, rather than an occupational qualification, did the court err in finding that Konda failed to prove a prima facie case that she could safely drive where UA had: doctors' opinions that Konda could safely drive; doctors' reports that Konda had never experienced "black-out spells" or "fainting spells," had never been hospitalized for diabetes, was "asymptomatic," "extremely resistant" to symptoms, and not prone to "great swings in blood sugar" or "los[ing] control of her facilities;" a report from the state government that daily duties "far exceeded the duties" of jet-bridge driving; a 28-year symptom-free job performance by Konda; a 28-year employee medical record that showed no symptoms or limitations; and a Human Resources department that admitted, "[p]rior to April 30, 2018, United had no documentation in its files indicating Ms. Konda had limitations or that she was unable to operate a jet bridge"? 1-ER-11.

7.     Did the court err in finding that the cause of compelling Konda to submit to a medical exam was lawful because, as the court explained, Konda "raised

the issue of medical limitation" where UA compelled the exam solely because Konda asked if UA intended to enforce a safety occupational qualification and where Konda did not request an accommodation? 1-ER-12.

8.      Did the court err in finding that the cause of compelling Konda to accept either a job transfer or unpaid leave was lawful because, as the court explained, "Konda was placed on leave because she could not perform her job duties and had declined to participate in the RAP process" where the reason for that compelled RAP accommodation process was Konda's disability? 1-ER-8.

9.      Did UA implement a third adverse action based on Konda's disability (in addition to the compelled exam and compelled leave) where it forced Konda to remain on unpaid leave after receiving an opinion from Konda's doctor that Konda was "able to detect and treat [hypoglycemic episodes] immediately on her own"?

10.     Did the court err in finding that UA lawfully accommodated Konda where it did not obtain any information about Konda's actual symptoms, limitations, and abilities, about how Konda's potential symptoms could interact with the mechanics and safety features of driving, or about remedies that could enable Konda to drive; UA did not engage in an interactive process to obtain that information and allowed discussion only about job transfers and unpaid leave as accommodations; there is no evidence UA ever considered allowing UA maintenance workers to deplane using airstairs or a cargo lift in the extremely unlikely event that they needed

11

to tow a plane in the 2:45 am 15-minute period; UA could have immediately accommodated by providing Konda the accommodation it eventually provided (allowing her to bring recovery food and insulin when she drove) had it gathered information from Konda? 1-ER-13

11.     Should this court consider or remand for consideration a bona fide occupational qualification defense where UA did not plead the defense, did not move to amend to plead the defense, and did not raise the defense in any summary judgment briefing to the court?

12.     Should this court consider or remand for consideration of any other defense where UA did not raise any defense in any summary judgment briefing to the court?

**13.**     Should this court reverse the trial court ruling and grant summary judgment to Konda on her disability and failure to accommodate claims?

## STANDARD OF REVIEW

In reviewing a district court's ruling on cross-motions for summary judgment, the Ninth Circuit reviews *de novo*. *Or. Nat'l Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1032 (9th Cir. 2020).

## STATEMENT OF THE CASE

## A. **Konda Could Safely Drive.**

In the first quarter of 2018, Konda was a healthy, capable person with normal mental skills and physical dexterity. She drove a car on a near daily basis often on freeways, on curvy roads, in heavy traffic, and during stormy weather. She engaged in sports like snowboarding. 2-ER-126. Konda had normal hand use and grip. 3-ER-405; 5-ER-884, 902. There is no probative evidence that Konda had any mental or physical deficiency.

A doctor diagnosed Konda with diabetes in 1990. 3-ER-339-370, 467. She learned to regularly monitor her blood sugar, which she could do within one to two minutes. 2-ER-183. Even without blood sugar monitoring, Konda learned to identify when her blood sugar was beginning to drop. 2-ER-173-4, 183; 5-ER-931. She developed a consistent habit of quickly eating recovery food when her blood sugar began to drop. 5-ER-931. In 28 years since being diagnosed, she experienced no significant symptoms or limitations, and specifically, she never fainted or experienced reduced cognitive ability because of her diabetes. 2-ER-126. She never altered her behavior due to her diabetes other than by testing and carrying supplies. 2-ER-174.

In early 2018, Konda had the mental skills and physical dexterity to perform the mechanics and safety features of driving, which UA added to Konda's position effective April 1. 4-ER-716. In fact, within months after the events at issue in this

13

case, starting in November, UA trained Konda to operate jet bridges, certified her to do so, had her do so, and ordered her to do so. 2-ER-172; 5-ER-931; 6-ER-991. Within a year after these events, UA permanently stopped requiring Konda to submit annual medical updates to retain her driving certification. 3-ER-440, 528; 7-ER-1316.

According to UA's Human Resources Business Partner, Anhvu Ly, who would play an important role in the events that would unfold, "[p]rior to April 30, 2018, United had no documentation in its files indicating Ms. Konda had limitations or that she was unable to operate a jet bridge." 2-ER-34; 7-ER-1315. UA had 28 years of Konda *not* exhibiting symptoms or limitations on the job. Konda's supervisor, Dustin Burtis, who had worked on the same shift with and then supervised Konda, knew Konda had exhibited no symptoms or limitations in the four years he had worked with her directly or the years thereafter. 2-ER-233. UA had 28 years of employee medical records that contained no evidence of significant symptoms or any limitations. 2-ER-233.

In fact, UA records emphatically said Konda had no significant symptoms. In 1990, Konda applied for a position that included jet bridge driving. UA learned of Konda's diabetes and permanently banned her from driving based on the diabetes. 3-ER-340, 350, 355. Konda filed a discrimination complaint with the State of California. During the investigation, UA learned from Konda's evaluating doctor

14

that they concluded Konda could safely operate jet bridges. UA learned from them that Konda had never experienced "black-out spells" or "fainting spells;" had never been hospitalized for diabetes; and was "asymptomatic," "extremely resistant" to symptoms, and not prone to "great swings in blood sugar" or "los[ing] control of her facilities." 3-ER-343, 370. UA learned that the California Department of Fair Employment and Housing had concluded Konda could safely drive jet bridges, there was no evidence she could not do so, and Konda's daily activities "far exceeded the duties" of driving. 3-ER-351.

UA had banned Konda based on a facially discriminatory occupational qualification that "preclude[ed]" every employee "with increased risk for loss of consciousness or for impaired alertness" from "work with hazardous machinery, operating vehicles" regardless of the person's actual symptoms and limitations. 3-ER-340, 350, 355; 7-ER-1145. UA had started questioning the legality of the qualification as early as 1991 when it stated in a settlement agreement with Konda that it would "review and/or revise, as necessary, [UA's] policy that pertains to the accommodation of physically handicapped individuals, in order to conform with state laws." 3-ER-348-9, 352-4. UA rescinded the 1991 qualification long before 2018. 2-ER-26-7; 5-ER-975. UA did not, however, rescind the ban.

In 2018, UA had every reason to believe Konda could safely drive and Konda had every reason to believe she was still banned.

15

### B. **UA Assigned Jet Bridge Driving.**

In early 2018, UA removed jet bridge driving from maintenance workers' duties and added it to all of UA's ATW employees and Customer Service positions, effective April 1. 3-ER-372, 374. Konda's Stations Operations Representative ("**SOR**") position fell within the Customer Service category.

Konda worked two shifts including one from 12:15 a.m. to 4:15 a.m. 2-ER-169; 3-ER-372. The only time Konda could be called to drive was during a 15-minute period between 2:45 and 3:00 a.m. three times a week. 2-ER-166, 168; 3-ER-460. During those three 15-minute periods a week, Konda would be the only person on site trained to drive. 3-ER-375. Other drivers who would be called to drive before Konda were scheduled to work before and after each of those three, 15-minute periods. 5-ER-943-53. Jet bridges, however, were rarely driven between 2:30 and 3:00 am. 2-ER-195; 3-ER-460; 5-ER-930.

Konda would not be called to drive at any other time during her shifts. 2-ER-273-4; 3-ER-310-13 (reverse seniority), 316 (Konda's seniority); 3-ER-375. There is no evidence that the maintenance crew ever needed to tow planes to the terminal between 2:45 and 3:00 am. When UA's maintenance workers towed a plane to an open gate in the terminal in the late night and early morning, they could deplane via a jet bridge or by using mobile airstairs or a cargo lift.

To drive a jet bridge, Konda would stand in a partially enclosed control booth away from the end that connects to the plane. The end that connects to the plane is closed off with safety doors that are opened only when the jet bridge is connected to the plane. Konda would stand at a control console attached to the wall a few feet above the ground and maneuver the jet bridge by pressing and holding a joystick or button. She could stop the jet bridge by removing pressure from the joystick or button. She could press a large emergency stop button immediately next to her on the console to brake all residual movement. 3-ER-475-77; 4-ER-685-92; 5-ER-930; 5-ER-934.

Even though UA required Konda to be trained, certified, and available to drive starting April 1, UA allowed Konda to remain in her position untrained, uncertified, and not able to drive from April 1 to July 4, and again after the events at issue here, from September 10 to November 8. 2-ER-42; 2-ER-172; 5-ER-988; 7-ER-1315; 7-ER-1331.

### C.    Konda Asked a Question.

On February 23, Konda explained to her immediate supervisor (Manager-Irregular Operations Strategy and Employee Communications) Dustin Burtis that she had not yet trained because of the ban and asked whether UA intended to enforce the ban based on the 1991 qualification. 2-ER-228; 5-ER-929-30. On March 24, Konda asked Burtis again about the ban. 5-ER-930. She explained that she had not

17

yet trained to drive because UA had permanently banned her pursuant to the 1991 qualification. 2-ER-228; 5-ER-930. Burtis did not answer the question. 5-ER-930. During a conversation with Burtis on or about April 13, Burtis was elusive and gave Konda a form to have a doctor complete. 5-ER-930. Burtis conveyed the question to his supervisor, David Overall, because this was not a standard process for him at the time. 2-ER-230. He admits he was inept in this regard: "I had not ever interacted with a situation quite like this where I needed to get this sort of medical documentation completed prior to waiving somebody of their obligations and duties of their role." 2-ER-232.

On March 28, Konda wrote Cynthia C. Spengler, UA's Station Training Coordinator, and explained and asked again:

> I need clarification and/or direction on my situation regarding jet bridge training.
>
> I have a couple of documents from United, one of which is a Medical Status Form, which says I am cleared for employment with the following *permanent* restriction:
>
> • Driving, working with hazardous machinery or above ground level
> At the time, I was told by UA Medical this includes jet bridges.
>
> I had a discussion with Dustin Burtis approximately 3 weeks ago about this without any clear response. I brought up the subject again last week Friday night. This time, he appeared to understand the situation. But again, I feel the issue was left hanging.
>
> It seems very clear to me that since I do not have anything in writing from United stating otherwise, I am not cleared to drive jet bridges, but I haven't received any acknowledgement from local management.

18

Where do I go with this?

5-ER-940. Konda did not refuse to train or drive, claim to have relevant symptoms or limitations, or request accommodation. 2-ER-126-27; 2-ER-173-74; 5-ER-931; 7-ER-1316. Never once did Konda inquire about accommodation; she merely asked for direction given the restriction placed upon her in 1990 by UA. 2-ER-175; 3-ER-340-70; 5-ER-987; 7-ER-1145.

UA's managers did not give Konda a direct answer. They did not tell Konda that UA had rescinded or would rescind the ban or the 1991 qualification on which the ban was based. 5-ER-929-30.

### D.   <u>No Effort to Comply with Bona Fide Occupational Qualification Requirements.</u>

UA did not inform Konda that she was being precluded from driving based on UA's occupational qualification. Additionally, the safety occupational qualification did not satisfy the requirements of a bona fide occupational qualification ("**BFOQ**"). UA presented no evidence that it applied the qualification to all covered employees, that it was essential to apply the qualification to all covered employees, or that it was essential to apply it to Konda due to her diabetes. Instead of treating the 1991 qualification as an occupational qualification, UA treated it as an essential function of the job.

19

### E. **Direct to Accommodation.**

Konda's questions to Overall were conveyed to Ly. On March 30, Ly stated, "I think we'll need to engage in the RAP process for this…." 3-ER-397. Burtis stated that after Konda asked about the ban, he responded by providing Konda a "form to be filled out by a medical professional and sent to United's ESC to update your medical file." 2-ER-229; 3-ER-402; 5-ER-930.

On April 18, without having discussed the situation with Konda, UA informed Konda that she could not perform the essential functions of her job and instructed her to get a medical exam to help UA identify a way to accommodate her presumed inability.

> In keeping with our commitment to equal employment opportunity and as reflected in our Working Together Guidelines, United Airlines strives to provide reasonable accommodations when appropriate *for employees with disabilities* or long term medical restrictions *who cannot perform an essential job function*.

> Per our voice mail on April 18, 2018, we would like to extend to you the opportunity to utilize our Reasonable Accommodation Program (RAP). This voluntary interactive process involves … [UA representatives] working together with you *to identify reasonable accommodation options*. Your situation will be considered on an individual basis.

> Enclosed with this letter, you will find a Medical Restriction Form and a copy of your job description. Please have your treating provider review your job description and complete the Medical Restriction Form with as much detail as possible *regarding your specific restrictions*.

4-ER-659. UA did not provide a Medical Restriction Form. It provided a WRF. 4-ER-660.

Additionally, UA did not provide a job description with the letter and WRF. 3-ER-431; 3-ER-473-4. After receiving the letter, Konda called the phone number listed on the letter to inform UA no job description was included with the letter. 3-ER-473.

The job description for the "Line Station Customer Service Representative/Ramp" ("LCRS") that UA presented in evidence is not relevant. It did not describe Konda's job. 4-ER-685-92. Konda did not work as an LCRS. 4-ER-685-92; 5-ER-929. Moreover, UA gave Konda the description on July 16, *after* the medical exam. 2-ER-132; 2-ER-190. UA never gave Konda a job description for her SOR position. 2-ER-132; 2-ER-190; 3-ER-475, 513; 4-ER-685-92. The trial court erred in concluding that she received an SOR job description with the original RAP letter. 1-ER-4. Moreover, since UA did not place the SOR description into evidence, there is no evidence it contained a description of jet bridge driving.

UA was still enforcing the ban. UA had not answered Konda's question about the ban or told her that it was rescinding the 1991 ban or underlying policy. In response to the question, UA immediately initiated a process solely to find accommodation, not to determine whether Konda could comply with the purported

21

essential function. It seemed Konda had two choices: look for an accommodation or get terminated.

On or about April 13, Konda told Burtis her endocrinologist had retired, and she could not get an appointment with a different endocrinologist in the seventeen days, from April 13 to April 30, that UA had allowed her to get an exam. 5-ER-930. Burtis told Konda to go to an urgent care clinic. 3-ER-402; 5-ER-930. Konda was forced to consult a doctor who did not know her medical history or have Konda's medical records. 5-ER-930. UA was aware that the doctor was a general practitioner with no prior relationship with Konda. 3-ER-402.

### F.  Insufficient Information and Instructions to Doctor.

There is no evidence that UA told Konda to provide her doctor with any instructions or information other than those stated in the March 28 letter. 4-ER-659. There is no evidence that UA provided the doctor the instructions and information that are required by WAC 162-22-090(2), (3) for an employer to rely on a doctor's report as a medical opinion. UA did not instruct the doctor to base the opinion "on the individual capabilities" of Konda and not on "generalizations as to the capabilities of all persons with the same disability," and base the opinion on "knowledge of the actual sensory, mental, and physical qualifications needed for proper performance of the particular job." UA did not "provide the health care professional with the necessary information about the particular job."

The introductory language on the WRF that the doctor was to complete told the doctor that the purpose of the form was to help UA find accommodation. It asked the doctor to state: (1)" yes" or "no" in response to "drive or operate equipment," (2) "clarification of above limitations," (3) "description of condition;" (4) "date of last treatment;" and (5) "condition commenced." The form did not ask the doctor to describe Konda's past and likely future symptoms, methods and effectiveness in controlling symptoms, resulting limitations, or her ability to perform the acts required to drive. The form requested no explanation for restrictions and no medical opinion. 3-ER-405.

## G. Uninformed and Inadequate Medical Exam.

On April 30, Konda met with a consulting doctor. UA presented no evidence that Konda explained the mechanics or safety features of driving to her doctor, which she could not do since she had no training or experience. UA presented no evidence that Konda asked the doctor to evaluate whether she could drive.

The doctor endorsed the ban checking "no" on the WRF below the statement "drive or operate equipment." She generically described Konda's type of diabetes as being "*at increased risk*" of drop in blood sugar that "*can affect*" the ability to function properly, which "*increases risk*" of transient fainting. 3-ER-402 (emphasis added). She did not state the restriction was based on an individualized assessment rather than generalizations about the condition. She did not state reasons for the

restriction. She did not describe past or likely future symptoms and limitations, past and likely future ability to control symptoms, or whether Konda's symptoms *could* interact with the mechanics and safety features of jet bridge driving to create a hazard.

### H.    Inferred Opinion Treated as Dispositive.

UA inferred an opinion from the factually unsupported, unexplained restriction. It presumed that the doctor had conducted an individualized assessment rather than an assessment based on generic diabetes symptoms. It treated the inferred opinion as dispositive.

There is no evidence UA relied on any information other than the factually supported, unexplained, unlawful, inferred opinion. UA knew it had compelled Konda to consult a general practitioner because Konda could not get an appointment with an endocrinologist in the thirteen days UA allowed. UA knew the doctor did not know Konda's medical history. UA knew it had provided the doctor none of the information and instruction required. UA did not care. Later, during litigation, UA embraced these actions:

> To suggest that United incorrectly relied upon Plaintiff's own doctor's medical opinion about her disability and work restrictions, or that United is required by law to advise Plaintiff's doctor on how to medically evaluate Plaintiff's disability or work limitations is nonsensical.

2-ER-29.

24

## I.    __Acknowledgement that Restriction in Effect.__

On May 29, UA's representatives met with Konda for a RAP meeting. They began by asking Konda to acknowledge the doctor had restricted her. 4-ER-664. UA asked Konda to sign an Assessment of Functional Capabilities form that UA had prepared beneath the statement, "I was informed of the above restrictions and understand that these restrictions apply to my activities both at work and during non-working hours." 4-ER-665. Konda acknowledged that she was restricted at work but not that she was actually physically limited by her diabetes: she struck out the words "during non-working hours."[2] The form did not require Konda to state that she had actual symptoms or limitations. Nothing about the form indicated that Konda's acknowledgement would transform an unexplained restriction into an opinion based on an individualized assessment.

## J.    __Results Dictated at the May 29 RAP Meeting.__

At the May 29 meeting, UA identified Konda's work restriction, stated her essential job functions included jet bridge driving, and offered to accommodate Konda only by transferring Konda out of her job. They did not discuss Konda's actual symptoms and limitations (which were none) or her ability to operate jet bridges or ability to operate jet bridges safely. 3-ER-428-29; 5-ER-867-70.

---

[2] Plaintiff inadvertently dated the AFC May 23, 2017. Plf.'s Dep. 137:12-25.

25

Without any discussion of how UA might accommodate Konda in her SOR position, UA informed Konda that she could not be accommodated in her current position. 2-ER-247; 3-ER-307. UA refused to have a substantive discussion about any aspect of the SOR position. 3-ER-428-29; 3-ER-453; 4-ER-679; 4-ER-694; 7-ER-1315.

UA offered to accommodate Konda only with a job transfer.

> We talked about the job requirements, the responsibilities of the SOR position, that an essential function of that job is to operate the jet bridge and that these limitations would prevent her from operating the jet bridge. [] I recall we advised her that based on these limitations we would not be able to accommodate her in the SOR position, however, we talked about other areas within the customer service representative classification where we could accommodate her, and we came up with the lobby…

2-ER-247-8. *See also* 3-ER-428-29; 2-ER-188.

### K.    <u>Compelled to Choose Transfer or Unpaid Leave.</u>

On June 6, Konda complained to UA's Ethics and Compliance about UA's failure to interact. 2-ER-133; 2-ER-205; 3-ER-532-34, 536; 4-ER-670-72; 4-ER-673; 5-ER-914; 5-ER-966; 7-ER-1327, 30. On June 28, she called again and reiterated her complaint to UA Medical Specialist, Joe Hernandez.; 3-ER-431; 3-ER-498-99, 505; 4-ER-619; 5-ER-930; 7-ER-1327. Hernandez stated the RAP process was "voluntary," and that Konda could withdraw at any time. 2-ER-186; 3-ER-498. Konda stated she would prefer to negotiate with local management. 5-ER-

26

930. Hernandez did not say Konda would be penalized if she did. 5-ER-930 Konda believed Hernandez to be providing her an opportunity to work with local management to gather ideas. 5-ER-930.

On July 3, Hernandez withdrew Konda from the RAP. 3-ER-431. UA forced Konda to choose either a permanent transfer to a lesser job or take unpaid leave. 2-ER-186; 2-ER-292; 3-ER-499, 502-3, 504; 4-ER-582-84, 617-18; 4-ER-679. Konda chose to take unpaid leave. 3-ER-502-3; 4-ER-582-83, 617-18, 631-33, 679, 696-98; 5-ER-958, 988

The job UA offered to Konda also included driving. UA explained that the transfer was permissible because it was extremely unlikely that Konda would be called to drive in that job. 2-ER-248; 3-ER-308. UA apparently considered the likelihood of being called to drive in its consideration of whether driving was an EFJ in *that* job.

In an email on July 5, Konda explained she did not want to end the discussion, but merely wanted UA to comply with the law and discuss the SOR position, EFJs of the position, and whether she was able to perform those EFJs.

> There have not been any discussion between myself and local management about the Station Operations Representative job duties, identifying essential or marginal functions or whether I am able to perform the essential functions. I do not see how I would be able to request an accommodation (if needed) before these are determined. I explained how in trying to follow the Americans with Disabilities Act guidelines, I felt the initial steps had been skipped.

27

2-ER-110; 4-ER-619-620; 5-ER-894; 5-ER-915; 5-ER-956.

On July 3, UA formally renewed the RAP process but did not reinstate Konda. Konda contacted UA on July 5 to discuss a second WRF form. 2-ER-110; 4-ER-619-620; 5-ER-894; 5-ER-915; 5-ER-956. On July 11, at Konda's request, Konda's doctor sent a letter to UA to provide additional information.

### L.    Delayed Return to Work.

On July 11, Dr. Renu Chawla sent UA a letter stating that Konda was "able to detect and treat [hypoglycemic episodes] immediately on her own" 3-ER-417. UA did not reinstate Konda.

On August 1, twenty-one days later, UA conducted a second RAP meeting. 3-ER-433-34. UA informed Konda that she could not continue in the SOR position. 3-ER-428-29. UA offered only to permanently reassign her to a lesser position or to keep her on unpaid leave. 2-ER-188; 3-ER-433-34.

Frustrated with these choices, Konda asked again about the permanent ban. She asked if UA would permit her to drive if she brought high-glycemic recovery foods and insulin with her. 2-ER-193; 3-ER-433-34. Konda had always carried these items and had a legal right under state and federal discrimination laws to carry them at work. 3-ER-465, 521-22; 5-ER-931-32.

UA responded that it probably would. But first, Konda was required to get approval from her doctor even though her doctor had already said Konda "was able

28

to detect and treat these immediately on her own" and the remedy was to eat simple carbohydrates when her blood sugar dropped. 2-ER-156; 3-ER-417; 3-ER-465, 521, 4-ER-625-26.

On August 17, Konda was able to get a revised WRF approving United's so-called accommodation that it would permit Konda to drive if she carried medical supplies that she always carried. This was not an "accommodation" since UA had no right to interfere with Konda's rights under the Americans with Disabilities Act and WLAD to carry medical supplies. Additionally, UA would have learned about this solution months earlier had it appropriately gathered information. 3-ER-436. UA approved the so-called accommodation on September 6, over one month after Konda first suggested it on August 1. 3-ER-436.

UA had refused to try to accommodate Konda in her position by assessing whether she could perform the essential functions of her job until the third meeting and then only at the prompting of Konda 4-ER-700, 3-ER-433-34. The sole focus of the RAP process was on transferring Konda or placing her on medical leave. 3-ER-428-29; 3-ER-453, 488; 4-ER-662-63; 4-ER-679; 7-ER-1316-17. At no time during the first two meetings did UA recommend any remediation which could be done for Konda's insulin-dependent diabetes, nor did UA permit Konda to speak about her individual management of her diabetes. 3-ER-428-29; 4-ER-679.

29

**M.** **Harm.**

As a result of UA's conduct, Konda endured a compelled unlawful medical exam; harassing, time-consuming, stress-inducing unlawfully compelled interactive accommodation processes; frustrating unlawful procedures in the compelled but unlawful accommodation processes; invasion into her private medical information; unlawful coercion to transfer into an unwanted job; forced leave; and lost wages due to the leave and to lost additional shifts.

## SUMMARY OF THE ARGUMENT

This court reviews a district court's ruling on cross-motions for summary judgment *de novo*. *Or. Nat'l Desert Ass'n*, 957 F.3d at 1032. This court should reverse the court's grant of United's summary judgment motion and grant Konda's summary judgment motion on Konda's discrimination claim. Driving was not an essential function and Konda proved she could perform the EFJs of her position (without the driving requirement).

If driving was an EFJ, safety was not. UA's safety standard was an occupational qualification that Konda has no duty to present evidence on or prove in her discrimination case. Konda proved she could perform the EFJs of driving (without the safety requirement).

If safety was an EFJ, Konda proved that she could drive safely.

The cause of each of the three adverse actions was Konda's disability.

This court should reverse the grant of summary judgment to United and grant summary judgment to Konda on Konda's claim for failure to accommodate. UA failed to gather information so that it could assess how to accommodate Konda in her position and failed to engage in a good faith interactive process. UA could have immediately accommodated Konda with the accommodation it eventually provided.

This court should not consider a BFOQ defense because UA did not plead or argue that defense on summary judgment. This court should not consider any other defense because UA did not argue any defense on summary judgment.

## ARGUMENT

## DISCRIMINATION

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. 56 (2010). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

A party seeking summary judgment must be granted summary judgment where the defendant fails to proffer "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Metaphysical doubt is insufficient, *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, as are conclusory, non-specific affidavits. *Lujan*, 497 U.S. at 888–89.

The Court will, however, enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has carried its burden under Fed. R. Civ. P. 56, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587 (cleaned up).

"[S]ummary judgment to an employer is seldom appropriate in discrimination cases because of the difficulty of proving a discriminatory motive. *Scrivener v. Clark Coll.*, 181 Wash. 2d 439, 444, 334 P.3d 541 (2014). As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000)

### B. DISABILITY DISCRIMINATION UNDER THE WLAD

#### 1. WLAD Elements

Pursuant to Wash. Rev. Code § 49.60.180(3) of the WLAD, employers may not discriminate on the basis of disability. To establish a disparate treatment claim of disability discrimination, a plaintiff has the burden of proving that (1) she has a disability or perceived disability, (2) she is a "qualified individual" who is able to perform the essential functions of the job, and (3) her disability or perceived

disability was a substantial factor in the defendant's decision to implement an adverse employment action. The plaintiff does not have to prove that the disability or perceived disability was the only factor or the main factor in the decision or prove that she would not have been subjected to the adverse action but for the disability or perceived disability. *Scrivener v. Clark Coll.*, 181 Wash. at 447; WPI 330.32.

The WLAD must be construed liberally to accomplish its purposes. Wash. Rev. Code § 49.60.020. *Kries v. WA-SPOK Primary Care, L.L.C.*, 190 Wash. App. 98, 104, 362 P.3d 974 (2015).

### 2. Direct and Circumstantial Evidence

A plaintiff may prove discriminatory intent through direct evidence or through the *McDonnell Douglas* burden-shifting framework to analyze discrimination claims at the summary judgment stage. *See, e.g., Riehl v. Foodmaker, Inc.,* 152 Wash. 2d 138, 150, 94 P.3d 930 (2004) (overturned by statute on other grounds); *Hill v. BCTI Income Fund-I*, 144 Wash. 2d 172, 180, 23 P.3d 47 (2001); ER 1314 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 792 (1973)); *Scrivener*, 181 Wash. 2d at 442-43.

A plaintiff may not be required to use the *McDonnell Douglas* framework if the plaintiff can produce direct evidence of discrimination or otherwise prove that the protected status was a substantial factor in the adverse decision. *Stork v. Int'l Bazaar*, 54 Wash. App. 274, 282-83, 774 P.2d 22 (1989); *Pannell v. Food Servs. of*

*Am.*, 61 Wash. App. 418, 433-34, 810 P.2d 952 (1991); *Kastanis v. Educ. Emps. Credit Union*, 122 Wash. 2d 483, 491, 859 P.2d 26 (1993). A plaintiff may argue under the direct evidence framework, the *McDonnell Douglas* framework, or both. *Alonso v. Qwest Commc'ns Co.*, 178 Wash. App. 734, 744, 315 P.3d 610 (2013). When a plaintiff presents direct evidence of a discriminatory motive, the burden-shifting framework is not required. *See Enlow v. Salem–Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004).

"Direct evidence of discriminatory intent consists of 'evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Rashdan v. Geissberger*, 764 F.3d 1179, 1184 (9th Cir. 2014). Generally, in a disability discrimination case, direct evidence consists of reliance directly on the condition, its symptoms, or its resulting limitations. *Carlson v. City of Spokane*, No. 13-CV-0320-TOR, 2014 U.S. Dist. LEXIS 148976, at *35 (E.D. Wash. Oct. 20, 2014) (direct evidence where employer expressed discomfort with allowing someone with employee's limitations to return to work, suggested a medical layoff, and expressed concerns that employee's symptoms might reduce her effectiveness and lead to complaints.) *See Enlow v. Salem–Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004) (direct evidence of age discrimination when a 73-year-old taxi driver was terminated because the company's insurance policy did not cover employees older than the age of 70); *Ezell v. Potter*, 400 F.3d 1041, 1051 (7th

35

Cir. 2005) (direct evidence where the employer told a new hire that they intended "to get rid of older carriers and replace them with younger, faster carriers")

Direct evidence need not be "specific and substantial." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) (quoting *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 662 (9th Cir. 2002) (alteration in original) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998))).

### 3. <u>Burden Shifting</u>

A plaintiff may prove discriminatory animus with circumstantial, indirect, and inferential evidence using the burden shifting framework. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 189 Wash. 2d 516, 526, 404 P.3d 464 (2017). Under this framework, the employee must present evidence of discrimination, the defendant must rebut, and then the plaintiff must rebut that and/or show pretext.

In order to prevail on a disability discrimination claim under WLAD using the burden shifting framework, a plaintiff must first establish a prima facie case of discrimination, showing that she: (1) is disabled, (2) is a "qualified individual" who can perform the essential functions of her job with or without accommodation, and, (3) suffered an adverse employment action because of her disability. *See Cornwell v. Microsoft Corp.*, 192 Wash. 2d 403, 430 P.3d 229, 234 (2018). Establishing a prima facie case creates a rebuttable presumption in a plaintiff's favor. *Scrivener*, 181 Wash. 2d at 446-47.

The employer bears the burden during the plaintiff's *prima facie* case to produce evidence that establishes those functions." *Bates v. UPS*, 511 F.3d 974, 991 (9th Cir. 2007) (citing *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 568 (8th Cir. 2007)). The employer must also "'clearly set forth, through the introduction of admissible evidence, reasons" why the function is essential to the job. *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original, citation and internal quotation marks omitted)).

If the plaintiff presents a prima facie case of discrimination, then the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Scrivener*, 181 Wash. 2d at 446. The employer's explanation must be one that "'disclaims any reliance on the employee's disability in having taken the employment action.'" *Carlson*, 2014 U.S. Dist. LEXIS at *37 (citing *Dark v. Curry Cnty.*, 451 F.3d 1078, 1084 (9th Cir. 2006)).

If the defendant presents sufficient evidence, then the burden shifts back to the plaintiff to produce sufficient evidence to create a genuine issue of material fact "(1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Scrivener*, 181 Wash. 2d at 446-47; *Bell v. Boeing Co.*, 599 F. Supp.

3d 1052, 1072-73 (W.D. Wash. 2022). At all stages, the employee may rely on circumstantial, indirect, and inferential evidence. *Bell, 599* F. Supp. At 1072.

Where the employee proves discrimination with direct evidence, the employee needs to prove only that discriminatory animus was a substantial factor in the decision at issue. The employer must then prove "that it would have taken the same action regardless of discriminatory animus." *Hegwine v. Longview Fibre Co.*, 162 Wash. 2d 340, 359-60, 172 P.3d 688 (2007) (citing *Hegwine v. Longview Fibre Co.*, 128 Wash. App. 340, 446 n.4, 115 P.3d 1065 (2007), *rev. den.*, 156 Wash. 2d 1027, 133 P.3d 473 (2006)).

### 4.    EFJS and Occupational Qualifications

Essential functions are fundamental job "duties" of the position." *Kries*, 190 Wash. App. at 125; *Bates,* 511 F.3d at 989. The term "job duties" in the definition of "essential functions" is defined as, "obligatory tasks, conduct, service, or functions." *Davis v. Microsoft Corp.*, 149 Wash. 2d 521, 533-34, 70 P.3d 126 (2003). The term "essential functions" describes what the employee must do.

Qualification standards are not essential functions of the job. *Kries*, 190 Wash. App. at 125-26 (citing *Bates*, 511 F.3d at 990 (relying on 29 C.F.R. § 1630.2 (n)(1), (q))). Occupational qualification standards are "personal and professional attributes" such as "physical, medical [and] safety" attributes the employer requires the employee to have. *Kries*, 190 Wash. App. at 125-27 (citing *Bates*, 511 F.3d at 990

and 29 C.F.R. § 1630.2) An occupational qualification can be an exception to discrimination if it is bona fide pursuant to WAC 162-16-27 and if the employee cannot satisfy the qualification. *Kries*, 190 Wash. App. at 132-34. While the ability to do the job is part of the definition of disability discrimination, a bona fide occupational qualification, on the other hand, is an exception to the rule against disability discrimination. *Kries*, 190 Wash. App. at 134, (citing *Rose v. Hanna Mining Co.*, 94 Wash. 2d 307, 616 P.2d 1229 (1980)).

The Ninth Circuit has emphasized that the difference is "crucial" because an employee need not meet all of the employer's qualification standards to show that he is qualified for purposes of the ADA. The employee need not do so because "it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly cannot meet because of his disability and that [proof] forms the very basis of his discrimination challenge." *Bates*, 511 F.3d at 991; *see also Carlson*, 2014 U.S. Dist. LEXIS at *15-16, (citing *Bates*, 511 F.3d at 990 and 29 C.F.R. § 1630.2(n)(1)).

The point of the "essential functions" definition is to define the job without reference to the employee's symptoms or limitations. The WLAD, like the ADA, was meant to protect "'a person with a disability [who] applies for a job and meets all selection criteria *except one that he or she cannot meet because of a disability*.'" *Bates*, 511 F.3d at 990 n.6 (quoting S. Rep. No. 101-116, at 37 (1989) (emphasis and

brackets in original). Essential functions consist of what the employee must *do*. Occupational qualifications describe what the employee must *be*.

"[T]he BFOQ defense is an affirmative defense. Defendants [are] required to produce facts in support of the BFOQ claim, rather than plaintiff being required to disprove it." *Gifford v. Atchison, T. & S.F.R. Co.*, 685 F.2d 1149, 1155 (9th Cir. 1982), (citing *Harris v. Pan Am. World Airways, Inc.*, 649 F.2d 670, 676 (9th Cir. 1980)).

### 5.   Proof a Function is Essential

The employer, not the employee, must prove that a job function is essential. *C*arlson, 2014 U.S. Dist. LEXIS at *14-15 (quoting *Bates*, 511 F.3d at 991 (quotation and citation omitted). To do so, the employer must (1) present information that determines that the function is essential and (2) "clearly set forth, through the introduction of admissible evidence, reasons for its actions" that would support a finding that the policy is an essential function of the job. *Samper*, 675 F.3d at 1237 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 507) (citation and internal quotation marks omitted); *Carlson*, 2014 U.S. Dist. LEXIS at *15.

A function is essential if it is "fundamental, basic, necessary, and indispensable to filling a particular position, as opposed to a marginal duty divorced from the essence of substance of the job." WPI 330.37. When determining whether a function is essential, Washington Courts look to the Equal Employment

Opportunity Commission (EEOC) factors: (1) the employer's judgment as to what functions of the job are essential; (2) written job descriptions; (3) the amount of time spent on the job performing the functions; (4) the consequences of not requiring the employee to perform the functions; (5) the terms of a collective bargaining agreement; (6) the past work experience of other employees in the position; and (7) the current work experience of employees in similar positions. WPI 330.37(3); *Dedman v. Pers. Appeals Bd.*, 98 Wash. App. 471, 479, 989 P.2d 1214 (1999).

In determining whether a function is essential, the employer may consider whether employees other than the disabled employee can do the function. The rule that an employer has no duty to assign a function of a disabled employee's job to another employee applies only when the employer is trying to accommodate the employee.

### 6. <u>Employer's Duty to Gather Information and Make Individualized Assessment</u>

To determine the second element, whether the employee can perform the essential functions with or without accommodation, the employer must make an individualized assessment. *City of Seattle v. Am. Healthcare Servs.*, Inc., 13 Wash. App. 2d 838, 468 P.3d 637 (2020). Employers have an affirmative duty to ascertain the nature and extent of an employee's disability. The employer must "gather [and assess] all relevant information regarding the applicant's work history and medical history." *Mantolete v. Bolger*, 767 F.2d 1416, 1423 (9th Cir. 1985); *see also Chevron*

41

*U.S.A. v. Echazabal*, 536 U.S. 73 (2002) ("Echazabal"); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999). "Great weight" should be given to the fact that the employee served for a long time without an incident. *Anderson v. Little League Baseball, Inc.*, 794 F. Supp. 342, 345 (D. Ariz. 1992) (three years of service without incident). Wash. Rev. Code § 49.60.040(7)(d) (interactive process required). Employers must assess how the disability will affect the employee's ability to perform the specific tasks and risks involved in the essential function. *Kries*, 190 Wash. App. at 134.

### 7.   Reliance On a Doctor's Opinion Pursuant to WAC 162-22-090

Under Washington law, employers may seek a health care professional's opinion on whether a person's disability affects the proper performance of a particular job if the employer provides the opinion the weight it deserves based on all the circumstances, including the extent of the health care professional's (1) knowledge of the employee and (2) knowledge of the job. WAC 162-22-090.

An employer may not rely on a doctor's opinion on whether the person can properly perform the particular job unless the report,

> (a) Is based on the individual capabilities of the particular person, and not on generalizations as to the capabilities of all persons with the same disability; and
> (b) Is based on knowledge of the actual sensory, mental, and physical qualifications needed for proper performance of the particular job.

WAC 162-22-090(2). The code provision advises it is the employer's duty "to provide the health care professional with the *necessary* information about the particular job and to inform the health care professional of the need for an individualized opinion." WAC 162-22-090(3)

The employer must assess the objective reasonableness of the physician's conclusions. It cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions. *Gillen v. Fallon Ambul. Serv.*, 283 F.3d 11, 31-32 (1st Cir. 2002). For example, the employer cannot "blindly rely" on a doctor's opinion where the doctor had no knowledge of the essential job functions because such reliance "belies the notion that [the doctor] subjected [the employee] to the individualized assessment mandated by the ADA." *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 484 (5th Cir. 2006); *see also Class v. Towson Univ.*, 806 F.3d 236, 257 (4th Cir. 2015).

### 8. <u>Scope of a Disability</u>

A disability includes conduct resulting from a disability, symptoms of the condition, remedial measures, and symptoms resulting from remedial measures. *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001). "[W]ith few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Carlson*, 2014 U.S. Dist. LEXIS at *37-38; *Stewart v. Snohomish Cnty. Pud No. 1*, 262 F. Supp. 3d 1089,

1102 (W.D. Wash. 2017) (symptoms caused by medication). The reason for the adverse action must "'disclaim[] any reliance on the employee's disability in having taken the employment action.'" *Carlson*, 2014 U.S. Dist. LEXIS at \*37 (citing *Dark*, 451 F.3d at 1084).

### 9.     Disparate Treatment in Terms and Conditions

Disparate treatment includes an adverse employment action that materially affects the terms, conditions or privileges of employment. Wash. Rev. Code § 49.60.180(3); WPI 330.01.02. Proof of different treatment is not required under the WLAD. This is especially true in disability cases. *Johnson v. Chevron U.S.A., Inc.*, 159 Wash. App. 18, 33–34, 244 P.3d 438 (2010).

Terms and conditions of employment include compelled medical exams, harassment, privacy of medical information, job retention and transfer, and compensation. *Hegwine*, 162 Wash. 2d at 357–58; *Stevens*, 200 Wash. 2d 531, 559, 519 P.3d 208 (2022) (citing 42 U.S.C. § 12112(d)(2)(A)) (medical exam); *Peterson v. Smurfit-Stone Container,* No. 51852-6-I, 2004 Wash. App. LEXIS 1146, at \*11-12 (June 1, 2004) (discharges, reassigns, or harasses); *Pulcino v. Fed. Express*, 141 Wash. 2d 629, 640, 9 P.3d 787, (2000) (discharges, reassigns, or harasses); Wash. Rev. Code § 49.60.180(3) (compensation); *Blackburn v. Soc. & Health Servs.*, 186 Wash. 2d 250, 375 P.3d 1076 (2016) (compensation); *Brzycki v. Univ. of Wash.*,

CASE NO. C18-1582 CKJ, 2021 U.S. Dist. LEXIS 30574, at *27 (W.D. Wash. Feb. 18, 2021) (compensation).

Regarding medical exams, the ADA expressly includes medical examination in the definition of the terms and conditions of employment. Federal law prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job … terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). It expressly defines medical exams as being terms and conditions, stating, "[t]he prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries. 42 U.S.C. § 12112(d)(1).

### 10.    "Because of" Disability

It is unlawful to discriminate "because of" disability. Wash. Rev. Code § 49.60.180. An adverse action undertaken to enforce a qualification is an action undertaken "because of" disability. The BFOQ defense is a defense against discrimination for that discriminatory act. The BFOQ defense arises because the act was based on disability. *Kries*, 190 Wash. App. at 130. The defense exempts the action from discrimination if the qualification is bona fide. WAC 162-16-240. "The ability to do the job is part of the definition of disability discrimination; a bona fide occupational qualification is an exception to the rule of nondiscrimination because of disability." *Kries*, 190 Wash. App. at 134.

An adverse action undertaken to penalize an employee who fails to participate in an employer compelled interactive accommodation process is also an action undertaken because of disability. If the employee could perform the essential functions and needed no accommodation, the acts of compelling and removal constitute disability discrimination. No law authorizes an employer to penalize an employee for failing to participate in a legally unnecessary interactive accommodation process.

### 11.   **Substantial Factor**

A "substantial factor" is a "significant motivating factor in bringing about the employer's decision" but need not be a "but for" or "determining" factor. WPI 330.01.01; *Mackay v. Acorn Custom Cabinetry*, 127 Wash. App. 302, 316, 898 P.2d 284 (1995).

### 12.    **BFOQ is an Affirmative Defense**

The BFOQ defense is an affirmative defense that is waived if not pleaded in the answer. Fed. R. Civ. P. 8(c), 12(b); *Blanchette v. Spokane Cnty. Fire Prot. Dist. No. 1*, 67 Wash. App. 499, 502, 836 P.2d 858 (1992); *In re Palmer*, 145 Wash. App. 249, 187 P.3d 758 (2008); *Harting v. Barton*, 101 Wash. App. 954, 962, 6 P.3d 91 (2000); Fed. R. Civ. P. 8 (c)(1), 12(b).

The employer bears the burden of proving the defense. *Blanchette*, 67 Wash. App. at 502; *Stewart v. Snohomish Cnty. Pub. Util. Dist. No. 1*, 752 F. App'x 444,

446 (9th Cir. 2018) (relying on *Kries* in concluding that the BFOQ is an affirmative defense).

To prove the BFOQ defense, the employer must prove (1) that it applies the requirement uniformly to all people in the job, and (2)(a) that all or substantially all individuals who fail to meet the requirement are unable to perform the job safely and efficiently, or alternatively, (b) that excluding those individuals was essential to the purposes of the position. WPI 330.04.

The BFOQ proof is also stated as follows: the employer must prove that (1) all or substantially all persons who lack the qualification are unable to safely and efficiently perform the duties of the job or (2) some excluded employees would be unable to perform safely and efficiently and it is impossible or highly impractical for the employer to distinguish the employees who do or do not present the risk. *Fey v. State*, 174 Wash. App. 435, 447-48, 300 P.3d 435 (2013); *Kries*, 190 Wash. App. at 134.

The employer must prove the qualification is narrowly drafted to describe the very minimum required in order to ensure that standard qualifications do not discriminate against employees who can properly perform the work despite a handicap. *Kries*, 190 Wash. App. at 134.

### 13.    Business Necessity Defense is Not Applicable to Disparate Treatment

The business necessity defense is not a defense to disparate treatment discrimination. It is limited to disparate impact claims. *Fey*, 174 Wash. App. at 447-48; *Kries*, 190 Wash. App. at 139 (citing *Shannon v. Pay N' Save Corp.*, 104 Wash. 2d 722, 730, 709 P.2d 799 (1985)); *see also,* Wash. Rev. Code § 49.60.180 (omitting reference to a business necessity defense).

### C.    Konda Proved UA Discriminated Against Her Based on Her Disability

### 1.    Konda Proved She Could Perform the Actual EFJs of the SOR Position

Konda proved UA discriminated against her. First, Konda proved she could perform the EFJs of her SOR position, which did not include driving as an EFJ. It was not essential for UA to have Konda available to drive during the three 15-minute periods a week. Jet bridges were rarely driven during that time. UA could have instructed its maintenance crew to refrain from towing during those 15-minute periods. There is no evidence UA considered allowing its maintenance crew to deplane using airstairs or cargo lifts. UA presented no specific evidence to show that either of these alternatives would have posed an undue hardship. It was not essential for UA to have Konda available to drive.

The court erred in finding that driving was an EFJ. Order, p. 8. The court failed to consider two important factors. The court quoted a portion of *Bates* in which

48

that court described the test for determining whether a function was essential, but the court ended the quote without including the next words in the quoted sentence in which the *Bates* court explained the test included a consideration of "[t]he amount of time spent on the job performing the function," 29 C.F.R. § 1630.2(n)(3)(iii); [and] "[t]he consequences of not requiring the [applicant or employee] to perform the function, 29 C.F.R.. § 1630.2(n)(3)(iv)." The amount of time Konda would have spent driving and the consequences of not having her drive are dispositive.

Konda proved she could perform the EFJs of her SOR position. She had done so for years. UA did she could perform the EFJs of her SOR position. Thus, the court erred in granting UA's summary judgment motion and denying Konda's on the discrimination claim.

### 2. Konda Proved She Could Perform the EFJs of Driving

If this court finds that jet bridge driving was an essential function, Konda still proved that UA discriminated against her. The safety requirement was not a job function. It was an occupational qualification that UA could rely on only as a BFOQ defense to discrimination. The court erred in treating the safety qualification as a job function that Konda had to address, produce evidence on, and prove in her discrimination case.

All evidence indicates that Konda could drive jet bridges. She had the mental skills and physical dexterity to push a button and lever and maneuver a jet bridge

properly. She eventually was trained, certified, ordered to, and did drive. UA never challenged Konda's ability to drive. It challenged her ability to do so safely, and safety was not and EFJ. Thus, the court erred in granting UA's motion and denying Konda's on the discrimination claim.

### 3.     Konda Proved She Could Drive Safely

If this court finds the safety standard was a job function rather than an occupational qualification, Konda still proved that UA discriminated when it imposed each of the three adverse actions. Konda proved with the information UA had at the time of each adverse action that she could comply with the safety requirement. She proved the information UA relied upon to implement each adverse action was either nonexistent or fatally flawed.

First, before the compelled exam, UA had the 1990-91 records from doctor that concluded Konda could safely drive. They told UA that Konda had never experienced "black-out spells" or "fainting spells;" had never been hospitalized for diabetes; and was "asymptomatic," "extremely resistant" to symptoms, and not prone to "great swings in blood sugar" or "los[ing] control of her facilities." 3-ER-343, 370. The State of California told UA that Konda could safely drive. There was no evidence she could not do so, and Konda's daily activities "far exceeded the duties" of jet-bridge driving. 3-ER-351. Beyond that, UA had 28 years of service with no symptoms and limitations and 28 years of medical files that showed no symptoms

and limitations. Ly testified in this litigation, "[p]rior to April 30, 2018, United had no documentation in its files indicating Ms. Konda had limitations or that she was unable to operate a jet bridge." 2-ER-34-35; 7-ER-1315.

Rather than rely on that information, UA relied on Konda's question about whether UA intended to enforce the factually unfounded ban that was based based on the facially discriminatory 1991 qualification.

Second, before the compelled leave, UA had all of the information described above. UA compelled the choice to accept a permanent transfer or unpaid leave based solely on the factually unsupported, unexplained, unlawful, inferred opinion that had no probative value. The doctor had no description of the specifics of driving. The doctor provided no information about Konda's actual symptoms, limitations, or ability to perform the tasks required for driving safely, no information indicating she made an individualized assessment of Konda's diabetes, and no explanation of the restriction. Neither the doctor nor UA had any evidence of an identifiable harm that *could* or *would likel*y result from the interaction of Konda's symptoms and limitations and the specifics of driving. UA gathered no other information and rebuffed Konda's attempts to provide more information.

Third, before the delayed return to work, UA had all of the information described above and failed to gather information as described above. Additionally, UA failed to promptly return Konda to work despite receiving dispositive evidence

51

from Konda's doctor that Konda was qualified: Konda is "able to detect and treat [hypoglycemic episodes] immediately on her own." 3-ER-416.

The court erred in finding that Konda failed to prove a prima facia case that she could drive safely and separately erred in in disregarding Konda's evidence. Order, 9:7-10 ("evidence indicating that [Konda] could not operate machinery during the relevant time period" "is undisputed"); Order, 9:19-20 ("Konda cites no authority to support her contention that United should have allowed her to perform a job inconsistent with her medical restrictions"). As a result of these errors, the court erred in granting UA's motion and denying Konda's on the discrimination claim.

### 4. Konda Proved UA was Substantially Motivated by Her Disability

UA's decision to implement each adverse action was substantially motivated by Konda's diabetes. UA cited no reason for any of the three adverse actions other than safety concerns due to Konda's diabetes. UA compelled the exam solely because Konda asked if UA intended to enforce the ban. The court erred in concluding that "rais[ing] the issue of medical limitation" transformed UA's motivation into something other than Konda's disability. To the extent that the court meant that "rais[ing] the issue of medical limitation" amounted to requesting accommodation, all parties agree that Konda did not request accommodation.

UA compelled Konda to choose a transfer or leave based solely on the factually unsupported, unexplained, unlawful, inferred opinion. The court erred in

concluding the compelled choice was lawful because it was motivated by Konda's alleged refusal to participate in the interactive accommodation process. UA compelled that process *because of Konda's disability* and punished Konda for allegedly refusing to participate in a process that it compelled *because of Konda's disability*.

UA's decision to delay Konda's return to work was also based solely on Konda's disability. It was based on the same reasons as those it relied on to compel the choice to transfer or take leave.

As a result of these errors, the court erred in granting UA's motion and denying Konda's on the discrimination claim.

### 5.    <u>Each Adverse Action Caused All of the Harm</u>

All damages flowed from the compelled exam. Without the compelled exam, none of the harm would have resulted. All damages also flowed from the compelled choice. Without the compelled choice, none of the harm would have resulted. All damages from the delayed return to work flowed independently from each of the three adverse actions.

### 6.    <u>The Court Should Not Consider a BFOQ Defense</u>

This court should neither consider nor remand for a consideration a BFOQ defense. UA did not plead, move to amend to plead, or otherwise put Konda on

notice of a BFOQ defense by pleading facts supporting the elements of the defense. Additionally, UA did not assert or argue a BFOQ defense in its briefing.

### 7. The Court Should Not Consider a Business Necessity Defense

The Court should not consider or remand for consideration a business necessity defense. Business necessity is not a defense to a disparate treatment claim. UA did not assert or argue the business necessity defense in its briefing.

## ACCOMMODATION

### A. ELEMENTS

An accommodation claim under the WLAD has four elements: an employee must establish that (1) he is disabled, (2) he is qualified for the job in question and capable of performing it with reasonable accommodation, (3) the employer had notice of his disability, and (4) the employer failed to reasonably accommodate his disability. *See McDaniels v. Grp. Health Coop.*, 57 F. Supp. 3d 1300, 1315 (W.D. Wash. 2014); *Pulcino*, 141 Wash. 2d at 643-44.

### B. MANDATORY INTERACTIVE ACCOMMODATION PROCESS

Employers have an affirmative duty to ascertain the nature and extent of an employee's disability to identify an accommodation. *Goodman v. Boeing Co.*, 127 Wash. 2d 401, 408, 899 P.2d 1265 (1995); *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000), *vacated on other grounds*, 535 U.S. 391 (2002). An employer must

cooperate with an employee, take "positive steps" to facilitate an exchange of essential information, tell the employee essential information, allow the employee to speak, listen to the employee, and explore possible accommodations with the employee. *Id.*; *Zivkovic*, 302 F.3d at 1089.

An employer is liable for failure to accommodate if the employer fails to engage in this process. *Goodman*, 127 Wash. 2d at 408.

> [T]he interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome. That's not the proactive process intended ....

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315-16 (3d Cir. 1999).

An employer must make a good faith attempt to accommodate a disabled employee *in her current position*. "Congress saw reassignment, as the EEOC does, as an option to be considered only after other efforts at accommodation have failed." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998); *see also Moore v. CVS Rx Servs.*, 142 F. Supp. 3d 321, 336 (M.D. Pa. 2015), *aff'd*, 660 F. App'x 149 (3d Cir. 2016); *Cravens v. Blue Cross & Blue Shield*, 214 F.3d 1011, 1019 (8th Cir. 2000).

Unpaid leave is not a per se reasonable accommodation. *Pulcino*, 141 Wash. 2d at 639. Likewise, eventual accommodation is a defense only when the employee's limitations cannot be objectively measured so that the employer can determine

whether accommodation is effective. *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wash. App. 765, 781-82, 249 P.3d 1044 (2011). Additionally, eventual accommodation is not a defense to a failure to accommodate resulting from failure to participate in good faith in the interactive process. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1110-11 (9th Cir. 2000).

## C. <u>DISCUSSION</u>

### 1. <u>Konda Proved UA Failed to Try to Accommodate Her in Her Position and Failed to Engage in a Good Faith Interactive Process</u>

Here, UA incompetently failed to obtain information from both Konda and her doctor about Konda's symptoms, limitations, methods of controlling symptoms, effectiveness of those methods, or ways Konda could remain in her position. It immediately and definitively concluded Konda could not drive. It did not seek and would not permit Konda to provide any of this information. While there is evidence that UA listed job functions in RAP meetings, there is no evidence that UA sought or allowed communication of the information it needed to find an accommodation that would allow Konda to stay in her position. Instead, UA discussed only transfers out of Konda's SOR position and unpaid leave from work. UA failed to engage in a good faith interactive process.

### 2. Konda Proved UA Could Have Immediately Accommodated Her in Her Position

UA could have accommodated Konda. First, UA eventually deemed not interfering with Konda's legal right to carry medical supplies to be an accommodation. It could have provided that so-called accommodation immediately had it gathered information about and facilitated communication regarding Konda's remedial methods. Second, there is no evidence that UA ever considered instructing its maintenance crew to use mobile stairs or a cargo lift in the extremely unlikely event that they needed to tow a plane in the 15-minute period at 2:45 am. UA presented no substantive evidence that using airstairs or a cargo lift would have posed any hardship.

As a result of these errors, the court erred in granting UA's motion and denying Konda's on the failure-to-accommodate claim.

### CONCLUSION

The court erred for the reasons stated above. Konda requests that this court reverse the trial court decision, deny UA's motion for summary judgment, and grant Konda's motion for summary judgment on the discrimination and accommodation claims.

RESPECTFULLY SUBMITTED this 10th day of September 2024.

THE BARTON LAW FIRM

*/s/ John Barton*
John Barton, WSBA No. 25323
THE BARTON LAW FIRM
*Attorneys for Appellant Konda*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

9th Cir. Case Number(s) _____23-4332_____

The undersigned attorney or self-represented party states the

following: [x ] I am unaware of any related cases currently pending

in this court.

[ ] I am unaware of any related cases currently pending in this court other than
the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court.
The case number and name of each related case and its relationship to this
case are:

Signature ___s/John G. Barton_____ Date _September 10, 2024_____

*(use "s/[typed name]" to sign electronically filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

9th Cir. Case Number(s) _____ 23-4332 _____

I am the attorney or self-represented party.

**This brief contains 11,647 words,** excluding the items exempted by Fed.

R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
  29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
  *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs;
  or [ ] a party or parties are filing a single brief in response to a longer joint
  brief.

[ ] complies with the length limit designated by court order dated

_____

. [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature ___s/John G. Barton_____ Date _September 10, 2024_____

*(use "s/[typed name]" to sign electronically filed documents)*

# ADDENDUM
# TABLE OF CONTENTS

| Description | Page |
| --- | --- |
| 28 U.S.C. § 1332(a) | ADD - 1 |
| 28 U.S.C. § 1291 | ADD – 2 |
| 42 U.S.C. § 12112(a), (d)(1), (d)(2)(A), | ADD – 3 |
| Federal Rules of Civil Procedure 8(c) | ADD – 4 |
| Federal Rules of Civil Procedure 12(b) | ADD – 5 |
| Federal Rules of Civil Procedure 56 | ADD - 6 |
| Wash. Rev. Code § 49.60.020 | ADD – 8 |
| Wash. Rev. Code § 49.60.180(3) | ADD – 9 |
| WAC 162-16-240 | ADD – 10 |
| 29 C.F.R. § 1630.2 (n), (q) | ADD – 11 |
| Washington Pattern Jury Instructions 330.01 | ADD – 12 |
| Washington Pattern Jury Instructions 330.02 | ADD – 13 |
| Washington Pattern Jury Instructions 330.04 | ADD – 14 |
| Washington Pattern Jury Instructions 330.32 | ADD – 15 |
| Washington Pattern Jury Instructions 330.37 | ADD - 16 |

28 U.S.C. § 1332(a)
**Title 28 – Judiciary and Judicial Procedure**
**Chapter 85 – District Courts; Jurisdiction**

**(a)**The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

    **(1)** citizens of different States;

    **(2)** citizens of a State and citizens or subjects of a foreign state, except that the district   courts shall not have original jurisdiction under this subsection of an action between      citizens of a State and citizens or subjects of a foreign state who are lawfully admitted      for permanent residence in the United States and are domiciled in the same State;

    **(3)**citizens of different States and in which citizens or subjects of a foreign state are       additional parties; and

    **(4)** a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C. § 1291
**Title 28 – Judiciary and Judicial Procedure**
**Chapter 83 – Court of Appeals**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**42 U.S.C. § 12112(a), (d)(1), (d)(2)(A),**
**Title 42 – Public Health and Welfare**

(a)General rule
No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

[. . .]

(d)Medical examinations and inquiries
    (1) In general
    The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries.


    (2) Preemployment
        (A)Prohibited examination or inquiry
        Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

## Federal Rules of Civil Procedure 8(c) – General Rules of Pleading

(c) Affirmative Defenses.

   (1) *In General.* In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including:

- accord and satisfaction;

- arbitration and award;

- assumption of risk;

- contributory negligence;

- duress;

- estoppel;

- failure of consideration;

- fraud;

- illegality;

- injury by fellow servant;

- laches;

- license;

- payment;

- release;

- res judicata;

- statute of frauds;

- statute of limitations; and

- waiver.

## Federal Rules of Civil Procedure 12(b)

(b) How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

## Federal Rules of Civil Procedure 56 – Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motion and Proceedings Thereon. The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

(d) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse

party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

(f) When Affidavits Are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

(g) Affidavits Made in Bad Faith. Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

**Wash. Rev. Code § 49.60.020 - Construction of chapter**
**Election of other remedies.**
**Title 49 – Labor Regulations**
**Chapter 60 – Commission Created**

The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof. Nothing contained in this chapter shall be deemed to repeal any of the provisions of any other law of this state relating to discrimination because of race, color, creed, national origin, citizenship or immigration status, sex, marital status, sexual orientation, age, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability, other than a law which purports to require or permit doing any act which is an unfair practice under this chapter. However, to the extent that distinction or differential treatment on the basis of citizenship or immigration status is authorized by federal or state law, regulation, or government contract, it is not an unfair practice. Nor shall anything herein contained be construed to deny the right to any person to institute any action or pursue any civil or criminal remedy based upon an alleged violation of his or her civil rights. This chapter shall not be construed to endorse any specific belief, practice, behavior, or orientation. Inclusion of sexual orientation in this chapter shall not be construed to modify or supersede state law relating to marriage.

**Wash. Rev. Code § 49.60.040 - Definitions**
**Title 49 – Labor Regulations**
**Chapter 60 – Discrimination – Human Rights Commission**

The definitions in this section apply throughout this chapter unless the context clearly requires otherwise.

*. *. *

(7)(a) "Disability" means the presence of a sensory, mental, or physical impairment that:

(i) Is medically cognizable or diagnosable; or

(ii) Exists as a record or history; or

(iii) Is perceived to exist whether or not it exists in fact.

(b) A disability exists whether it is temporary or permanent, common or uncommon, mitigated or unmitigated, or whether or not it limits the ability to work generally or work at a particular job or whether or not it limits any other activity within the scope of this chapter.

(c) For purposes of this definition, "impairment" includes, but is not limited to:

(i) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine; or

(ii) Any mental, developmental, traumatic, or psychological disorder, including but not limited to cognitive limitation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(d) Only for the purposes of qualifying for reasonable accommodation in employment, an impairment must be known or shown through an interactive process to exist in fact and:

(i) The impairment must have a substantially limiting effect upon the individual's ability to perform his or her job, the individual's ability to apply or be considered for a job, or the individual's access to equal benefits, privileges, or terms or conditions of employment; or

(ii) The employee must have put the employer on notice of the existence of an impairment, and medical documentation must establish a reasonable likelihood that engaging in job functions without an accommodation would aggravate the impairment to the extent that it would create a substantially limiting effect.

(e) For purposes of (d) of this subsection, a limitation is not substantial if it has only a trivial effect.

**Wash. Rev. Code § 49.60.180(3) – Unfair Practices of Employer**
**Title 49 – Labor Regulations**
**Chapter 49.60 – Discrimination – Human Rights Division**

It is an unfair practice for any employer:

. . .

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability: PROVIDED, That it shall not be an unfair practice for an employer to segregate washrooms or locker facilities on the basis of sex, or to base other terms and conditions of employment on the sex of employees where the commission by regulation or ruling in a particular instance has found the employment practice to be appropriate for the practical realization of equality of opportunity between the sexes

### WAC 162-16-27-ER-1314 – Bona fide occupational qualification.
### Title 162 – Human Rights Commission
### Chapter 16 - Employment

Under the law against discrimination, there is an exception to the rule that an employer, employment agency, labor union, or other person may not discriminate on the basis of protected status; that is if a bona fide occupational qualification (BFOQ) applies. The commission believes that the BFOQ exception should be applied narrowly to jobs for which a particular quality of protected status will be essential to or will contribute to the accomplishment of the purposes of the job. The following examples illustrate how the commission applies BFOQs:

(1) Where it is necessary for the purpose of authenticity or genuineness (e.g., model, actor, actress) or maintaining conventional standards of sexual privacy (e.g., locker room attendant, intimate apparel fitter) the commission will consider protected status to be a BFOQ.

(2) A 911 emergency response service needs operators who are bilingual in English and Spanish. The job qualification should be spoken language competency, not national origin.

(3) An employer refuses to consider a person with a disability for a receptionist position on the basis that the person's disability "would make customers and other coworkers uncomfortable." This is **not** a valid BFOQ.

(4) A person with a disability applies for promotion to a position at a different site within the firm. The firm does not promote the person because doing so would compel the firm to install an assistive device on equipment at that site to enable the person to properly perform the job. This is **not** a valid BFOQ.

## 29 C.F.R. § 1630.2 (n), (q) – Definitions

(n) *Essential functions*—(1) *In general.* The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

[. . .]

(q) *Qualification standards* means the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired.

### Washington Pattern Jury Instructions 330.01 – General—Disparate Treatment—Burden of Proof
### Chapter 330 – Employment Discrimination

**Discrimination in employment on the basis of** *[age] [creed] [marital status] [national origin] [citizenship or immigration status] [race][religion] [gender] [sexual orientation] [honorably discharged veteran status] [military status]* **is prohibited.**

**To establish [his] [her] "disparate treatment claim,"**(name of plaintiff) **has the burden of proving each of the following propositions:**

    **(1)** **That**(name of defendant)**took an adverse employment action against**(name of plaintiff)**; and**

    **(2)** **That**(name of plaintiff)**'s** *[age] [creed] [marital status] [national origin] [citizenship or immigration status] [race] [religion] [gender] [sexual orientation] [honorably discharged veteran status] [military status]* **was a substantial factor in**(name of defendant)**'s decision to take the adverse action.**

**If you find from your consideration of all the evidence that both of these propositions have been proved, your verdict should be for**(name of plaintiff)**[on this claim]. On the other hand, if either of the propositions has not been proved, your verdict should be for**(name of defendant)**[on this claim].**

**Washington Pattern Jury Instructions 330.02 - Employment Discrimination—
Disparate Impact—Definition
Chapter 330 – Employment Discrimination**

**It is unlawful for an employer to** *[engage in a practice] [apply a preference]
[impose a requirement] [use an overall selection process]* **[**(other adverse action)**]
that has a disparate impact on [**(describe protected status)**] [, unless it is justified
by business necessity].**

**A** *[practice] [preference] [requirement] [overall selection process]* **[**(other adverse
action)**] has a "disparate impact" if it is apparently neutral in its treatment of
individuals regardless of [**(describe protected status)**], but in fact falls more
harshly on [**(describe group disparately impacted)**].**

## Washington Pattern Jury Instructions 330.04 - Bona Fide Occupational Qualification (BFOQ) Defense
### Chapter 330 – Employment Discrimination

**It is unlawful for an employer to** *[refuse to hire] [discharge]* **any person because of such person's** *[age] [creed] [disability] [marital status][national] origin] [race] [religion] [gender] [sexual orientation] [honorably discharged veteran status] [military status]*. **It is a defense to** (name of plaintiff)**'s** *[refusal-to-hire] [discharge]* **claim if the requirement of** (describe requirement) **is a bona fide occupational qualification.**

**To establish that [his] [her] [its] requirement is a bona fide occupational qualification,** (name of defendant) **has the burden of proving both of the following propositions:**

> **(1)    That** (name of defendant) **applies the requirement uniformly to all** *[applicants for] [candidates for] [persons in]* **the job; [and]**

> **(2)    That all or substantially all individuals who fail to meet the requirement are unable to perform the job safely and efficiently or that excluding those individuals was essential to the purposes of the position.**

**If you find from your consideration of all of the evidence that** (name of defendant) **has proved that [his] [her] [its] decision** *[not to hire] [to discharge]*(name of plaintiff) **was based on a bona fide occupational qualification, then you should find in favor of** (name of defendant)**[on this claim].** **If, however, you find from your consideration of all the evidence that** (name of defendant) **has failed to prove either proposition (1) or (2), then your verdict should be in favor of** (name of plaintiff)**[on this claim].**

**Washington Pattern Jury Instructions 330.32 - Disability Discrimination—
Disparate Treatment—Burden of Proof
Chapter 330 – Employment Discrimination**

**Discrimination in employment on the basis of disability is prohibited.**

**To establish [his] [her] claim of discrimination on the basis of disability,** (name of plaintiff) **has the burden of proving each of the following propositions:**

**(1)** **That [he] [she]** *[has a disability]* **[or]** *[is perceived to have a disability]***;**

**(2)** **That [he] [she] is able to perform the essential functions of the job in question** *[with reasonable accommodation]***; and**

**(3)** **That [his] [her]** *[disability]* **[or] [the perception of [his] [her] disability] was a substantial factor in** (name of defendant's) **decision** *[to terminate] [not to promote] [not to hire]* **[him] [her] [to lay [him] [her] off].** **(**Name of plaintiff) **does not have to prove that** *[perceived]* **disability was the only factor or the main factor in the decision. Nor does** (name of plaintiff) **have to prove that [he] [she] would have been** *[retained][hired] [promoted]* **but for [his] [her]** *[perceived]* **disability.**

**If you find from your consideration of all of the evidence that each of these propositions has been proved, then your verdict should be for** (name of plaintiff) **[on this claim]. On the other hand, if any of these propositions has not been proved, your verdict should be for** (name of defendant) **[on this claim].**

ADD - 16

**Washington Pattern Jury Instructions 330.37—Essential Function—Definition**
**Chapter 330 – Employment Discrimination**

An essential function is a job duty that is fundamental, basic, necessary and indispensable to filling a particular position, as opposed to a marginal duty divorced from the essence or substance of the job.

In determining whether a function is essential to a position, you may consider, among others, the following factors:

(1) The function may be essential because the reason the position exists is to perform that function;

(2) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed;     and/or

(3) The function may be highly specialized so that the employee in the position is hired for his or her expertise or ability to perform the particular function.

Evidence of whether a particular function is essential includes, but is not limited to:

(1) The employer's judgment as to which functions are essential;

(2) Written job descriptions prepared before advertising or interviewing applicants for the job;

(3) The amount of time spent on the job performing the function;

(4) The consequences of not requiring the employee to perform the function;

(5) The terms of a collective bargaining agreement;

(6) The work experience of past employees in the job; and/or

(7) The current work experience of employees in similar jobs.